[No. E046457. Fourth Dist., Div. Two. Aug. 14, 2009.]

STARLIGHT RIDGE SOUTH HOMEOWNERS ASSOCIATION, Plaintiff and Appellant, v.
STEPHANIE K. HUNTER-BLOOR, Defendant and Respondent.

## Counsel

Fiore, Racobs & Powers and Peter E. Racobs for Plaintiff and Appellant.

Stephanie K. Hunter-Bloor, in pro. per.; Law Office of John Scott Carter and John Scott Carter for Defendant and Respondent.

## Opinion

**MILLER, J.**—Plaintiff and appellant Starlight Ridge South Homeowners Association (the Association) is the owners association of a common interest development. Defendant and respondent Stephanie K. Hunter-Bloor (the homeowner) is the owner of a residential lot in the development. The Association claimed that the homeowner was responsible for upkeep and maintenance of a portion of a drainage channel (the V-ditch) crossing her lot. The homeowner contended that, instead, the Association was responsible for the costs of maintaining the section of the V-ditch crossing her property, because at that location the V-ditch section was wholly contained within a landscape maintenance area, and the Association was charged with the duty of maintaining the landscape maintenance area. The Association filed an action against the homeowner for injunctive and declaratory relief. Each party filed a motion for summary judgment. The trial court, interpreting the covenants, conditions and restrictions (CC&R's), granted the homeowner's summary judgment motion and entered judgment in favor of the homeowner. The Association has appealed, contending that the trial court erred in its interpretation of the CC&R's. We agree with the Association, and we therefore reverse the judgment.

### FACTUAL AND PROCEDURAL HISTORY

Starlight Ridge is a common interest development in Temecula, California. Its declaration of CC&R's was recorded in 1985. The homeowner lives in a residence on a lot within the Starlight Ridge development; the lot is subject to the CC&R's. The homeowner acquired title by an interspousal transfer deed in 2005.

The Association was created pursuant to the CC&R's. The CC&R's designated certain " 'Landscape Maintenance Areas,' " defined as "all plantings, planted trees, shrubs, irrigation systems, walls, sidewalks and other landscaping improvements described in Exhibit 'B' [giving a metes and bounds description] which are to be maintained by the Association . . . ." The described areas and the drawings depicting their map location show the landscape maintenance areas bordering the entrances into the development,

and wrapping around the frontage. One of these landscape maintenance areas runs across the entire rear portion of the homeowner's lot, outside the fence across her backyard.

Just outside the development ran an easement owned by the Metropolitan Water District (MWD). Across a number of the lots backing up to the MWD easement, and parallel to the easement, ran a V-ditch, a concrete drainage channel. The V-ditch also ran across the back of the homeowner's lot. The portion of the V-ditch running across the back of the homeowner's lot was entirely within the landscape maintenance area on her lot.

Section 6 of the CC&R's dealt with the landscape maintenance areas. Paragraph 6(a) provided that, upon the conveyance of the first residential lot, the developer would grant an easement, and the Association would obtain an encroachment permit for the landscape maintenance areas. The Association would "thereupon assume and thereafter perform all obligations of the [developer] for the maintenance, repair and restoration of such Landscape Maintenance Areas." The developer undertook, before the transfer, to complete the installation of improvements, facilities, landscaping and planting in substantial conformance with the landscaping plans. Paragraph 6(c) provided that the owner of a lot that had a landscape maintenance area as a part of the lot would have an exclusive easement for enjoyment, except for the Association's easement for maintenance. The Association's easement for maintenance was "a nonexclusive easement for ingress and egress over the Lots within that Phase for the purposes of repair, reconstruction, restoration, landscaping and maintaining the landscaping of the Landscape Maintenance Areas . . . ." (¶ 6(d).)

Section 7 of the CC&R's provided for allocation of maintenance and repair duties between the owners and the Association. Paragraph 7(b) provided: "The Association shall maintain the Landscape Maintenance Areas, including all improvements, facilities, landscaping and planting thereon in good condition and repair and in substantial conformance to the landscaping plans . . . ." Paragraph 7(c) covered the owners' obligations to maintain the exterior of the residences, "including, without limitation, roofs, doors, windows, gutters, downspouts, exterior building surfaces, walls, fences and gates, sidewalks, paving, trees, landscaping, including slope area maintenance, planting, and all other exterior improvements." Paragraph 7(e) provided that, "No Owner shall interfere with or obstruct the established surface drainage pattern over any Lot, unless an adequate alternative provision is made for the proper drainage and is first approved in writing by the Architectural Control Committee and the County Engineer of the County of Riverside. Any alteration of the established drainage pattern must at all times comply with all applicable local ordinances. For the purpose hereof, 'established' drainage is defined as the

drainage which exists at the time the overall grading of a Lot is completed by [the developer]. Each Owner shall maintain, repair, and replace and keep free from debris or obstructions the drainage system and devices, if any, located on his Lot."

The Association took the view that the V-ditch was a drainage system or device on the homeowner's lot, for which the homeowner was responsible. The V-ditch was in poor condition and had partially collapsed; the Association sent the homeowner a notice to repair the V-ditch. The homeowner refused, contending that, because the V-ditch on her lot was wholly within the landscape maintenance area, the obligation for maintenance and repair fell to the Association.

The Association filed this action for declaratory relief, seeking a construction of the CC&R's that the obligation to maintain the V-ditch belonged to the homeowner, and for an injunction compelling her to repair the V-ditch.

The Association moved for summary judgment. Its statement of undisputed material facts indicated that the homeowner owned the lot in question, that the CC&R's, paragraph 7(e) assigned to each owner the duty to "maintain, repair, and replace and keep free from debris or obstructions the drainage system and devices, if any, located on his Lot," that the concrete drainage V-ditch existed on the homeowner's lot, and that the homeowner failed to repair, maintain or replace the damaged V-ditch.

The homeowner opposed the Association's motion for summary judgment, and filed her own motion for summary judgment in response. In her statement of undisputed facts, she declared that she owned the property in question, the V-ditch was on the property, the portion of the V-ditch on her property was wholly within the landscape maintenance area, the property was subject to the CC&R's, and the CC&R's assigned maintenance responsibility to the Association for the landscape maintenance area, including any "improvements" or "structures" located there.

The homeowner also included several statements to the effect that the Association had maintained the landscape areas so poorly that the Association's actions had undermined the V-ditch and caused its collapse.

Each motion for summary judgment was premised exclusively as a matter of interpretation of the CC&R's. The trial court granted the homeowner's motion for summary judgment and denied the Association's motion: "I believe that within the landscaped maintenance area, that reasonably it is considered that a v-ditch, which is part of, in this Court's opinion, landscaping, it's commonly seen on slopes, it's commonly seen in hilly areas, to the

same extent that the plaintiff has bushes, you have sprinklers. You don't mention sprinklers here, you refer to 'irrigation' and so forth. But this CC&R doesn't refer to valves, it doesn't refer to sprinklers, it doesn't refer to bits and parts and pieces of an irrigation system by specific language here. [¶] And what you're indicating to me is that within the terms described within the CC&Rs as to landscaped maintenance areas, that the Court should go to the interpretation or the description of what drainage means as to the lot as a whole, whereas clearly it says here, in the Court's opinion, that the landscaped maintenance area is the responsibility of the [Association], and the Court's interpretation is that that is inclusive of the v-ditch."

A final judgment was filed in favor of the homeowner, and the Association appeals.

## DISCUSSION

### A.  *Standard of Review*

After a motion for summary judgment has been granted, an appellate court "examine[s] the record de novo and independently determine[s] whether [the] decision is correct. [Citation.]" (*Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1149 [119 Cal.Rptr.2d 131].) In doing so, we use the same three-step process employed by the trial court. First, we identify the issues raised by the pleadings. Second, we determine whether the moving party's showing establishes facts sufficient to negate the opposing party's claims, and to justify judgment in the moving party's favor. If so, third, we determine whether the opposing party has raised a triable material issue of fact. (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 392 [134 Cal.Rptr.2d 689].)

### B.  *Step One—Issues Tendered by the Pleadings*

The complaint contains two causes of action, for injunctive and declaratory relief. Both causes of action seek a construction of the CC&R's; the Association contends that the CC&R's assign financial responsibility for upkeep and repair of the V-ditch to the homeowner, as the property owner on whose property the facility, or a part thereof, exists. The homeowner's opposition to the Association's motion for summary judgment, as well as her own motion for summary judgment, also relied exclusively on the proper legal construction of the CC&R's. The issue is one of interpretation of a written instrument. It presents a question of law, which we review de novo. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125 [76 Cal.Rptr.3d 585].)

C. *Step Two—The Association's Showing Was Sufficient to Justify Judgment in Its Favor*

The facts are essentially undisputed. The V-ditch is a facility for storm water runoff drainage. It runs across numerous lots, including the homeowner's lot. It just so happens that, on the homeowner's lot, the portion of the V-ditch that crosses the homeowner's property also lies within the bounds of the designated landscape maintenance area.

The various obligations and duties of the owners within the development and the Association are described in and governed by the CC&R's. The Association's moving papers pointed to paragraph 7(e) of the CC&R's, which provides in part: "Each Owner shall maintain, repair, and replace and keep free from debris or obstructions the drainage system and devices, if any, located on his Lot."

Although paragraph 1(j) of the CC&R's defined the landscape maintenance areas as "all plantings, planted trees, shrubs, irrigation systems, walls, sidewalks and other landscaping improvements . . . which are to be maintained by the Association," and paragraph 7(b) provided that the Association was responsible for maintaining the common areas and landscape maintenance areas, the Association argued that the drainage maintenance provision was the more specific provision, which controlled over the provision that, generally, the Association was to maintain the landscape maintenance areas.

This construction of the document, pursuant to the Association's motion for summary judgment, is at least facially reasonable and legally tenable. If correct, it is sufficient to justify a judgment in the Association's favor.

D. *The Homeowner Has Failed to Raise a Triable Issue of Fact, or Otherwise Show That the Association Is Not Entitled to Judgment*

In opposition, as in her own motion, the homeowner did not dispute any essential facts, but rather argued for a different interpretation of the CC&R's. The homeowner objects that the Association has focused on one sentence of paragraph 7(e) of the CC&R's, without taking account of the entire provision. Paragraph 7(e) states in full: "No Owner shall interfere with or obstruct the established surface drainage pattern over any Lot, unless an adequate alternative provision is made for the proper drainage and is first approved in writing by the Architectural Control Committee and the County Engineer of the County of Riverside. Any alteration of the established drainage pattern must at all times comply with all applicable local governmental ordinances. For the purpose hereof, 'established' drainage is defined as the drainage which exists at the time the overall grading of the Lot is completed by [the developer].

Each Owner shall maintain, repair, and replace and keep free from debris or obstructions the drainage system and devices, if any, located on his Lot. Water from any Lot may drain into adjacent streets, but shall not drain onto adjacent Lots unless an easement for such purposes is granted herein or in the recorded subdivision map for the Project. [The developer] hereby reserves for itself and its successive owners, over all areas of the Project, easements for drainage from slope areas and drainage ways constructed by [the developer]."

The homeowner contends that this provision for the maintenance of existing drainage patterns, set by grading of the lots, is a general provision, and that paragraph 7(b) of the CC&R's, assigning responsibility for maintaining the landscape maintenance areas to the Association, is the more specific provision. Thus, she argues, paragraph 7(b) is controlling over paragraph 7(e), and the Association is responsible for the expenses of maintaining the drainage facility V-ditch wherever it is contained within the landscape maintenance area.

■ The salient issue is: which interpretation is controlling? The principles governing construction of written instruments are well settled. "The mutual intention of the contracting parties at the time the contract was formed governs. [Citations.] We ascertain that intention solely from the written contract, if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. [Citations.] We consider the contract as a whole and construe the language in context, rather than interpret a provision in isolation. [Citation.] We interpret words in a contract in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. [Citation.] If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. [Citation.]" (*Westrec Marina Management, Inc. v. Arrowood Indemnity Co.* (2008) 163 Cal.App.4th 1387, 1392 [78 Cal.Rptr.3d 264].)

■ Here, each party contends that its interpretation is consistent with the plain meaning of the words in the CC&R's. Neither interpretation works an obvious absurdity. The interpretations are inconsistent, however. Where two provisions appear to cover the same matter, and are inconsistent, the more specific provision controls over the general provision. (Code Civ. Proc., § 1859.) Each party points to different provisions as being the more general or the more specific: according to one view, the Association's duty to maintain the landscaping areas is general, whereas the owners' obligations to maintain drainage devices on their lots is specific; according to the other view, the owners have a general obligation to maintain drainage patterns on their lots, while the Association's duty to maintain the landscape areas is specific.

To reconcile the conflict, we take account of and attempt to give effect to the likely intentions of the creators at the time the instrument was written, as well as the circumstances under which it was made and the subject matters that it treats. We may also properly take account of the acts and conduct of the parties after the contract is executed, as effectively a practical construction of the instrument by those directly affected. (*Jones v. P.S. Development Co., Inc.* (2008) 166 Cal.App.4th 707, 720 [82 Cal.Rptr.3d 882].)

Here, the Association proffered some evidence in support of its motion of the actions of the Association and other property owners with respect to the owners' obligations to maintain and repair the V-ditch or other drainage facilities. The CC&R's had been in force for approximately 20 years. Throughout that time, precisely in accordance with its interpretation of paragraph 7(e) of the CC&R's, the Association had enforced the obligations of individual owners to maintain and repair drainage devices existing on their lots at the owners' expense. The homeowner produced no evidence to contradict the Association's showing on this point. The only difference between the homeowner's situation here, and the situations of the other property owners, is that the drainage device on the homeowner's property happens to also be contained within the area described as a landscape maintenance area. But it is generally true that, historically, the individual property owners and not the Association have been responsible for repairs to drainage devices like the V-ditch.

The circumstances surrounding the creation of the CC&R's also indicate the relative importance of the subject matter of the competing duties. The landscape maintenance areas are confined to small areas bordering the entrances of the development. Their purpose is aesthetic. The owners' duties with respect to drainage affect the fundamental integrity of each lot and the development as a whole.

In her brief on appeal, the homeowner makes an argument that the property owners collectively have an easement over the entirety of the V-ditch. The developer created an easement for the V-ditch drainage; the developer wanted to convey the easement for the V-ditch to the County of Riverside, but the county did not accept the easement. The homeowner contends that the developer then conveyed the easement to the property owners (presumably collectively). That is, the CC&R's declare that the development "shall be held, sold and conveyed subject to the following Declaration [i.e., the CC&R's] as to division, easements, rights, liens, charges, covenants, servitudes, restrictions, limitations, conditions and uses to which the Project may be put, hereby specifying that such [CC&R's] shall operate for the mutual benefit of all Owners of the Project and shall constitute covenants to run with the land and shall be binding on and for the benefit of [the developer], its

successors and assigns, the Starlight Ridge South Homeowners Association, its successors and assigns, and all subsequent Owners of all or any part of the Project, . . . for the benefit of the Project, and shall, further, be imposed upon all of the Project as a servitude in favor of each and every lot within the Project as the dominant tenement." From this language, the homeowner derives the notion that *all* the property owners collectively own the dominant tenement to which the V-ditch is subject, and that the responsibility to maintain the V-ditch therefore is a collective one imposed pro rata on all the property owners. She argues: "[i]t is well settled that the servient estate has no duty to maintain or repair the easement. 'The grantee, or owner of the easement, is bound to keep it in repair, and this applies as well to water ditches as to private ways.' (*Bean v. Stoneman* (1894) 104 Cal. 49, 55–56 [37 P. 777].) [¶] As the dominant tenement, then the [property owners] have the exclusive responsibility to maintain the easement."

The CC&R's provisions on which the homeowner relies establish that the *CC&R's*—not merely the drainage easement—apply to all the lots within the development "as a servitude for the benefit of each and every lot within the development, as the dominant tenement." The CC&R's themselves, however, expressly specify that the responsibility to maintain the drainage facilities lies with any lot owner upon whose lot the facility exists.

The homeowner's argument concerning the dominant and servient tenements proves too much, in two different ways. First, there is nothing to show the conveyance of the easement for the V-ditch to the Association or any other collective entity. The failure to transfer the V-ditch easement to the County of Riverside has resulted, as the homeowner contends, in conveyance of the easement to the property owners, i.e., the property owners who bought the lots on which the V-ditch resides. Thus, the owners of lots on which the V-ditch exists own both the dominant and the servient tenements; the obligation of maintenance and repair falls to the individual owners to whom those lots were conveyed. This theory accords with the assignment, within the CC&R's, of the obligation of maintenance and repair of the V-ditch to the individual homeowner on whose lot the facility exists.

Second, the natural consequence of the homeowner's contention would be that the property owners collectively, as represented by the Association, would own the easement (dominant tenement), and thus the costs of maintenance and repair of the V-ditch would be shared equally by all the property owners, through pro rata assessments. Indeed, the homeowner makes this argument. But that argument would apply equally to the entire V-ditch easement, and not only to portions of the V-ditch lying within the bounds of the landscape maintenance areas. Yet the conflict arises here solely because of the coincidence, on the homeowner's lot, of the V-ditch corresponding to the

same area assigned as a landscape maintenance area. In practice, for the past 20 years, the Association has never collected general assessments for repairs of the V-ditch, whether within a landscape maintenance area or otherwise. The only way that the homeowner here is able to argue that the Association should be responsible, is her contention that the landscape maintenance area provisions are the more specific, which control over the otherwise applicable drainage provisions.

The CC&R's also contain provisions assigning responsibility to individual lot owners for the maintenance of other kinds of facilities within the development. That is, certain areas of the land within the development were designated as "private property native open space," and consisted of open areas of native vegetation. The developer was required, under paragraph 7(d) of the CC&R's, initially to irrigate and maintain "the planted trees on the slopes of the Private Property Native Open Space for a minimum of twenty-four (24) months . . . from the date the tree planting program is completed . . . . Upon expiration of the 24 month period, [the developer] . . . shall have the right to terminate the irrigation and maintenance of the planted trees and harden off the planted trees and leave them to grow in a natural unirrigated state . . . . [The developer] shall offer the continued responsibility of irrigation and maintenance to the Association. Should the Association accept such responsibility any further obligation and duty to irrigate and maintain the planted trees shall belong to the Association . . . .

"In any event, the Owner has the obligation to maintain the native vegetation within the Private Property Native Open Space situated within the Owner's Lot, in its original state to prevent soil erosion problems. This obligation does not preclude the mowing of certain areas of the Private Property Native Open Space by the Owner to maintain proper fire protection . . . . In any case, surface vegetation must be maintained by the Owner. Should an area become denuded, it is the Owner's responsibility to replant said area with native grasses and provide supplemental irrigation until the erosion protection characteristics are re-established. In the event Owner does not accomplish said work in a responsible time and manner, the Association shall have the right to perform said work at Owners expense."

The developer accepted responsibility only to establish the trees in the native open space; otherwise, maintenance of all other plants in the native open space areas was assigned by the CC&R's to the individual owners upon whose lots the open space was situated. The maintenance of the native open space areas was not an expense shared pro rata among *all* the property owners, and was not a matter subject to pro rata assessments.

The similar assignment of responsibility for maintenance of the native open space to the individual owners upon whose property the native open space is

situated, supports the Association's construction of the CC&R's with respect to responsibility to maintain drainage facilities. The Association's interpretation and its historical practice accords with the individual property owner's responsibility to repair and maintain both drainage and native open space areas, if any, located on a particular lot.

The homeowner points to certain other provisions of the CC&R's which she contends mandate the Association to maintain the V-ditch within any landscape maintenance area. Paragraph 1(j) of the CC&R's defines a landscape maintenance area as "all plantings, planted trees, shrubs, irrigations systems, walls, sidewalks and other landscaping improvements . . . ." Paragraph 1(i) defines "Improvements" as "all structures and appurtenances thereto of every kind, including, but not limited to, residential structures, driveways, walkways, fences, walls, retaining walls, poles, signs, trees and other landscaping." In these provisions, the homeowner discerns a broad obligation on the Association to maintain every conceivable kind of "structure," including the V-ditch, that lies within the landscape maintenance area.

While we place no great reliance on the Association's argument that the word "Improvements" in the definitional paragraph is capitalized, whereas the definition of the landscape maintenance areas does not capitalize the word with respect to "landscape improvements," we do consider the modifier to limit the Association's obligations to *landscape* improvements. The V-ditch is a storm water drainage channel. The trial court's remarks indicated that it considered the V-ditch as possibly a part of the irrigation system sustaining the landscape maintenance area, but the purpose of the V-ditch is altogether different from the aesthetic purpose of the landscape maintenance area. Indeed, the V-ditch extends far beyond the landscape maintenance area. On virtually all lots on which the V-ditch exists, the individual lot owner is responsible for the expense of maintaining the V-ditch. The homeowner here is seeking a relative windfall of having *all* the property owners, through general assessments, pay to maintain the V-ditch facility on her lot, solely because of the fortuity that at that location the V-ditch happens to be located within the bounds also designated for the landscape maintenance area.

The homeowner objects that another provision of the CC&R's prevents her from entering to repair the V-ditch, "even if she wanted to." Paragraph 11(g) of the CC&R's provides, "Except as otherwise provided in the [CC&R's], there shall be no obstruction of the Landscape Maintenance Areas, and nothing shall be altered, constructed, planted in, or removed from the Landscape Maintenance Areas without the prior written consent of the Association." Here, the CC&R's do "otherwise provide." First, they provide that any owner on whose lot a landscape maintenance area is located may have exclusive enjoyment of the landscape maintenance area, subject to the

Association's easement. The CC&R's also provide otherwise by expressly assigning responsibility for maintenance of drainage facilities to the individual lot owners. In addition, even if the Association's written consent were required, the Association's written demand of the homeowner that she repair the V-ditch would suffice to constitute such consent.

The homeowner complains that the Association, by its conduct in failing to properly maintain the landscape maintenance area, contributed to or caused the damage to the V-ditch on her property. The question of whether another party may be responsible for causing the damage to the partially collapsed V-ditch may involve factual questions, but those factual issues pertain to a cause of action that has not been pled here. A cause of action by the homeowner for indemnity or contribution, or for negligence, is wholly separate from the issues tendered by the pleadings here, which pertain only to the general assignment by the CC&R's of the duty of maintenance in the first instance. The homeowner here has not filed a cross-action to recoup her costs from the Association or any other assertedly negligent party. Thus, the homeowner's complaints that the Association may have caused the V-ditch's deteriorated condition do not present any material factual questions which are actually at issue.

■ The plain language of the CC&R's could support either of the proffered interpretations. The circumstances of the creation of the CC&R's indicate that the maintenance of drainage is of fundamental importance, while the maintenance of the landscape maintenance areas is primarily an aesthetic concern. The V-ditch is a relatively large structure, and the function of drainage maintains the integrity of the land. The landscape maintenance areas are relatively small in area. The conduct of the parties to the agreement for the past 20 years indicates behavior consistent with assigning responsibility for maintenance of the V-ditch to the individual property owners. The evidence on this point is undisputed. The bulk of the V-ditch has always been maintained at the expense of other individual property owners whose lots the V-ditch crosses; the homeowner here seeks to avoid that result, and to have all the property owners within the entire development bear the expense for the portion of the V-ditch on her lot, solely because the V-ditch there happens to also coincide with the landscape maintenance area. Under the circumstances of creation, and in practice, the CC&R's assign general responsibility for landscape maintenance areas to the Association, but specifically provide that individual property owners will be responsible for drainage facilities, if any, on their property. This interpretation is also supported by parallel provisions concerning individual property owners' responsibility to maintain native open space on their lots. The homeowner here has failed to raise a triable issue of material fact on any issue tendered by the complaint. The sole factual matter she raises—who might be responsible for causing the damage to the V-ditch—does not pertain to the causes of action pled.

We conclude, therefore, that the trial court erred in denying the Association's motion for summary judgment, and in granting summary judgment in favor of the homeowner.

## DISPOSITION

For the reasons stated, the judgment in favor of the homeowner is reversed. The trial court is instructed to enter a new order, granting the Association's motion for summary judgment. The Association is to recover its costs on appeal.

Richli, Acting P. J., and King, J., concurred.