Filed 12/12/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| ORANGE COVE IRRIGATION DISTRICT, | C078323, C078888 |
| Plaintiff, Cross-complainant and Appellant, | (Super. Ct. No. CI3811) |
| v. | |
| LOS MOLINOS MUTUAL WATER COMPANY, | |
| Defendant, Cross-defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Tehama County, John J. Garaventa, Judge. Reversed.

O'Laughlin & Paris, William Charles Paris, III and Timothy J. Wasiewski for Plaintiff, Cross-complainant and Appellant.

Gallery & Barton, Jesse William Barton for Defendant, Cross-defendant and Respondent.

The owner of an appropriative right to water in a creek sought declaratory relief to determine whether, under the judicial decree that established the right, it may (1) use

1

water appropriated to it on a year around basis and not only during the irrigation season; (2) use or transfer its water outside of the creek's watershed; and (3) make these changes in the use and location of use without obtaining prior approval of the creek's water master or the superior court.

The trial court declared the decree did not give the owner these rights. We reverse the judgment.

## FACTS AND PROCEEDINGS

Mill Creek drains a watershed of approximately 135 square miles. It begins at the base of Mt. Lassen and travels in a westerly direction until it drains into the Sacramento River near the towns of Tehama and Los Molinos in Tehama County. In a year of normal rainfall, Mill Creek's volume is approximately 250 cubic feet per second (cfs) when the irrigation season begins.

By a stipulated decree issued in 1920, the Tehama County Superior Court adjudicated water rights in Mill Creek. It declared the natural flow of the water up to a total rate of 203 cfs had been appropriated by the parties appearing before it for use upon their and other persons' lands. The decree entitled these original owners of the water rights and their successors to continue diverting from Mill Creek a total of 203 cfs of water, and it allotted them shares in the amount of water each could divert. It entitled the owners to use or dispose of their share of water in any manner, at any place, or for any purpose, or in accordance with whatever agreement the owners may make with any other person or entity.

As part of the decree, the court also appointed a water master of Mill Creek to implement its order. The decree gave the water master exclusive authority to divert and apportion the water during the irrigation season according to the decree's terms, measure the diversions, and control and superintend the diversions and the gates and ditches used to divert the water.

2

By succession of interest, respondent Los Molinos Mutual Water Company (Los Molinos) is the current water master of Mill Creek. It also holds water rights entitling it to receive approximately 140 cfs of the 203 cfs diverted from the creek. As the water master, it diverts and apportions the water during the irrigation season and delivers it to its shareholders and the other owners of decreed water rights through a system of canals and ditches.

Typically, Los Molinos has delivered Mill Creek water from April to October each year primarily to irrigate pastures and orchards and for watering stock. Due to limitations in its conveyance system, Los Molinos combines the diverted water and delivers it on a rotational basis instead of simultaneously. Each rotation takes generally 12 to 14 days, but it takes longer during a drought or later in the season as Mill Creek flows decrease. By the middle of July, all of Mill Creek's available surface water, by then down to a volume of less than 100 cfs, is being diverted. By August, the owners' demand exceeds the supply of water. In September, the rotation period can exceed 18 days due to the lack of water. Meeting the water needs of all the owners becomes impossible because deliveries may occur less than twice a month.

In October, water demand decreases as harvest occurs, but there is almost no flow in Mill Creek downstream from Los Molinos's last diversion dam except for a small amount bypassed by Los Molinos and another rights holder at the request of the state to support salmon migration.

As rains begin in November, Los Molinos shuts down its system of canals and ditches for maintenance and repair while flows in Mill Creek begin to increase.

The record indicates Mill Creek is usually low in October, but flows increase afterward. A study prepared for the State Water Resources Control Board found that from 1998 to 2012, average daily flows in Mill Creek below Los Molinos's last diversion dam were greater than 50 cfs only 28 percent of the month of October, but were greater than 85 cfs approximately 98 percent of the time from November 1 through May 31.

3

With limited exceptions, Los Molinos does not divert or deliver any water again until April, when the cycle repeats. It does not provide irrigation water in the winter months because pasture vegetation and orchard trees are dormant and irrigation is not necessary. It has never delivered water 365 days a year for any purpose.

Appellant Orange Cove Irrigation District (District) supplies water for parts of Fresno and Tulare Counties in Central California. It receives its water from the federal Central Valley Project under a contract with the United States Bureau of Reclamation.

In 2000, the District acquired decreed rights to Mill Creek water. Its rights authorized it to receive approximately 10.5 cfs of the diverted 203 cfs. The District's predecessors in interest historically used the water to irrigate land within Los Molinos's service area. The District acquired only the rights to the water; it did not purchase any land within the Mill Creek watershed.

The District acquired the water rights to offset fees imposed on its purchase of federal water. Federal law imposed a surcharge on the District's purchase of Central Valley Project water to fund environmental restoration projects. (Pub.L. No. 102-575, §§ 3406(b)(1), (c)(1); 3407(b) (Oct. 30, 1992) 106 Stat. 4706.) The District hoped to offset the surcharge by having Los Molinos hold its water rights in trust and use the water to increase flows in Mill Creek to improve salmon migration. For a variety of reasons, however, the District was not able to use its Mill Creek water rights as planned.

In 2009, the District determined to put its water rights to other uses, including municipal, industrial, agricultural or environmental uses by a downstream user. In the meantime, the District issued Los Molinos a license to continue using its share of Mill Creek water.

In 2010, the District granted an option to a private developer to purchase some of its Mill Creek water rights. The developer intended to use the water for a redevelopment project in Napa County. Los Molinos submitted comments as part of the redevelopment project's environmental review. It stated it had always been its understanding and

4

practice "that the rights adjudged in the 1920 decree are seasonal in nature, and limited to the irrigation season, which typically lasts from April to October." Ultimately, the developer did not exercise its option to acquire the District's rights.

Following Los Molinos's comments on the project, District representatives met with Los Molinos representatives to discuss the District's plan to transfer its water rights to a person or entity located outside the Mill Creek watershed for any reasonable use. Los Molinos, acting as water master, stated it would not agree to implement any transfer of Mill Creek water that was (1) outside of what it considered to be the irrigation season; (2) to be used outside of the Mill Creek watershed; or (3) not approved by the superior court as being consistent with any applicable law.

In 2013, the District revoked Los Molinos's license to use its Mill Creek water rights and stated it intended to make alternative beneficial use of them "within the basin of origin, downstream of the historic point of diversion."

In response, Los Molinos said it "will not agree to transfer any of the water claimed by [the District] unless and until a Tehama County judge determines the water rights can be transferred in the manner requested by [the District] consistent with the requirements and limitations (e.g. season of use, purpose of use, amount of use, place of use, point of diversion, etc.) contained in the [1920] Decree and California Water Code section 1706."

The District brought this action against Los Molinos for declaratory relief. It sought a declaration that (1) the 1920 decree authorized it to use its water rights year round and not just during the irrigation season; (2) the decree did not prohibit it from transferring its rights for use outside the Mill Creek watershed; (3) Los Molinos as water master was not authorized to grant or deny prior approval for the District's proposed transfer of water rights on the basis the transfer will result in injury to another as defined in Water Code section 1706; (4) Los Molinos was not authorized by the decree to determine the quantity of water the District may transfer; (5) Los Molinos was not

5

authorized by the decree to refuse to effectuate a proposed transfer of water on condition the Superior Court approved the transfer; and (6) Los Molinos breached its duties by refusing to effectuate the District's proposed transfer. The District also sought attorney fees.

Following a trial based on stipulated facts, the trial court entered judgment against the District. The court ruled the decree (1) authorized the water right owners to use their water only during the irrigation season; (2) did not authorize the owners to use their water at any place; and (3) required any change to the purpose or place for using the water to be approved by Los Molinos or the court. The court reformed the phrase "at all times" wherever it appeared in the decree to mean "at all times during the irrigation season." Accordingly, the court also held Los Molinos did not breach its duties under the decree. The District filed a notice of appeal against the judgment.

The trial court also awarded attorney fees to Los Molinos. In its judgment, it cited no authority for awarding the fees. However, at a later hearing on a motion for fees brought by Los Molinos, the court awarded fees of $53,248.75 under Code of Civil Procedure section 1021.5. The District filed a separate notice of appeal from this order. We have consolidated the appeals for purposes of argument and decision.

DISCUSSION

I

*Denial of Declaratory Relief*

The District contends the trial court misinterpreted the 1920 decree. It claims the decree's plain language, its structure, and the rights owners' historical conduct establish the decree (1) authorizes the District to use its water rights any time of year and not only during the irrigation season; (2) authorizes the District to use its water rights outside of the Mill Creek watershed and Los Molinos's service area; and (3) does not require it to

6

obtain prior approval from Los Molinos or the superior court to change the purpose or place for using the water.  We agree.

A.    *The Decree*

To analyze the parties' arguments, we first review the decree in detail.  Doing so, we see its potentially conflicting nature of granting owners the right to use their water at any time, at any place, and for any purpose, while also requiring the water master to apportion and measure the diverted water only during the irrigation season.  To resolve this conflict, we are tasked to interpret the decree as a whole so as to give effect to the mutual intentions of the court that approved it and the parties who agreed to it.  (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195; *Dow v. Lassen Irrigation Co.* (2013) 216 Cal.App.4th 766, 780-781.)

The decree resulted from a stipulation by the parties in *Los Molinos Land Co. v. Clough* (Super. Ct. Tehama County, 1920, No. 3811).  Prior to that action, Los Molinos's predecessor in interest and the other eight parties to the decree had appropriated and diverted water from Mill Creek (then known as the Los Molinos River) in the aggregate amount of 203 cfs.  (Decree, § I.)  The water had been used by the parties "for the benefit of the several tracts of land" they owned and "certain other tracts of land" they did not own.  (§ I.)  The water continued to be needed "for useful and beneficial purposes" upon those lands.  (§ I.)

The decree's section III entitled the parties and their successors "to divert from [Mill Creek] in the aggregate all of the water flowing therein *whenever* such gross flow shall not exceed a total of two hundred and three (203) cubic feet per second, and *at all other times* all of the water flowing therein up to a total of two hundred and three (203) cubic feet per second."  (§ III, italics added.)

The decree allotted to each of the parties a specific share of the 203 cfs and prioritized the order in which each could receive the water.  (§ IV.)  No matter the share,

7

section IV of the decree authorized each party to divert its share whenever water was running in Mill Creek. Seven of the nine parties were entitled to divert their shares "at all stages of the flow" in the creek. The District's water rights originated from one of these original parties, Mary Runyon. The decree granted the remaining two parties the right to divert water "at all times." For these other parties, the decree authorized diversions no matter how much water was flowing in the creek.

In addition to delineating the parties' water rights, the decree vested broad discretion in each of the parties to decide how it diverted its share of the water and how and where it used its water. Regarding the diversion of water, section VII of the decree states: "Each of said parties is and will be *at all times entitled* to take and divert from [Mill Creek] the quantity of water herein and hereby allotted to such party at such point or points on said river as such party may see fit, and by such means as such party may see fit to adopt, or to procure such quantity of water to be diverted from said river for the benefit of such party under any arrangement with any other person or corporation, or by or through any diversion works constructed or operated by any other person or corporation." (§ VII, italics added.)

Section VII of the decree granted the parties discretion to determine how and where to use their water as follows: "Each of said parties is and will be *at all times* entitled to use or dispose of the share allotted to such party of the water of said river *in any manner, at any place, or for any purposes which such party may desire*, *or in accordance with whatever agreement or arrangement such party may make with any other person or corporation*." (§ VII, italics added.)

The decree sought to equalize each party's rights, subject to the draw priorities it established, and it superseded any rights of priority held by riparian users. Section VII states the quantities of water each party is entitled to divert from Mill Creek include whatever quantities the parties are entitled to divert "by virtue of owning land riparian thereto" or by virtue of any grant from a riparian owner or any appropriation of water

8

previously made. Section VII continues: "Except as herein expressly declared, no priority of right in respect to the waters of said river exists as between said parties, the right of each of them in respect to said water being on a parity with the rights of all of the others of said parties, and all of them being entitled to exercise simultaneously and *continuously* their several rights as herein defined." (§ VII, italics added.)

The decree entitled certain of the parties to continue using a diversion ditch to receive their Mill Creek water. The ditch, known as Runyon Ditch, conveys diverted Mill Creek water to parties south of the creek. (§§ VII, X, XIV.) Los Molinos's and the District's predecessors in interest were two of those parties and also co-owners of the ditch. The decree's section VIII entitled the ditch's co-owners to continue using Runyon Ditch to receive diverted Mill Creek water. (§ VIII.)

We note that, according to the District's option agreements with the developer mentioned above, the rights it acquired were derived from those referred to in the decree "as the rights of Mary Runyon, et al., on the Runyon Ditch and/or Buena Vista Lateral . . . ." The Buena Vista Lateral or ditch system transports water from Runyon Ditch. It appears the Runyon rights are pre-1914 rights, as the decree states the water rights of Ms. Runyon and certain other parties are subject to an indenture dated April 21, 1911, in which Ms. Runyon both received and transferred rights. (§ V.) The parties also assume in their arguments that the rights associated with the 1920 decree are pre-1914 rights. Appropriative rights obtained before 1914 are not subject to the state's statutory scheme for acquiring appropriative water rights. (*Nicoll v. Rudnick* (2008) 160 Cal.App.4th 550, 557.)

In order to carry out its provisions, the decree established the position of water master. It appointed Los Molinos's predecessor in interest as the water master of Mill Creek and also of Runyon Ditch. (§§ VIII, X, XIV.) For ease of reference, we will refer to the water master and Los Molinos interchangeably, as Los Molinos holds that responsibility today.

9

Unlike its provisions allowing the owners to exercise their rights at any time and in any manner, the decree established the irrigation season as the time of year when the water master was required to perform its duties on Mill Creek. We quote section X of the decree: "As [the Mill Creek] Water Master [Los Molinos] shall at all times *during the irrigation season of each calendar year* make or cause to be made in conformity with the provisions of this decree the necessary apportionment of the water then flowing in [Mill Creek] among the several ditches and canals then being maintained or operated by or for the parties . . . ; and shall discharge all such other duties as normally belong to the office of Water Master. As such Water Master it shall *at all such times* have and exercise control over and superintend any and all diversions of water from said river by all such ditches and canals, and the opening and closing or changing or regulating of any and all gates or other appliances whereby such diversions of water from said river shall be effected; and for that purpose shall have authority to enter upon any land of any of said parties upon which there shall be any ditch, canal, [etc.] for the diversion or conveyance of water, and to direct and superintend the placing and installation of proper gates for controlling the diversion of water from said river and proper devices for the measurement and registration of the quantities of water being from time to time diverted and conveyed by such ditches, canals or other means." (§ X, italics added.)

The decree also requires Los Molinos to measure the flows during the irrigation season. Under the decree's section XII, Los Molinos is to "take or cause to be taken at intervals of not exceeding one week throughout *the period of time between the first day of May in each calendar year and the close of the irrigating season of such year*, accurate measurements of the gross flow of [Mill Creek], and also of the quantity of water flowing in each ditch or canal . . . and shall keep accurate records of such measurements in permanent form . . . ." (§ XII, italics added.)

The decree imposes similar responsibilities on Los Molinos as water master of Runyon Ditch. The decree requires Los Molinos to perform its duties on Runyon Ditch

10

at all times and whenever requested, but it is to deliver water using the ditch to the extent the owner is entitled to the water from Mill Creek at the time of delivery. Of relevance here, section XIV of the decree requires Los Molinos "*at all times* [to] take proper steps to control and restrict and keep account of the quantities of water from time to time being diverted from said Runyon Ditch by any and all persons so that there shall *at all times* remain in said ditch sufficient water to make up the aggregate of the quantities of water [to which the other owners] shall be entitled to have flowing in said ditch at such times. It shall, *whenever requested* by any person entitled to receive water from said Runyon Ditch, open and close the diversion gates on said Runyon Ditch in such way as to supply to such person the quantity of water desired not exceeding the quantity to which such person may *at such time be* entitled by reason of his rights in respect to the waters of [Mill Creek]. No water shall at any time be diverted from said Runyon Ditch, and no diversion gate thereon shall at any time be opened or closed, except by or through [Los Molinos], [subject to exceptions not relevant here]. No alteration or change . . . in any diversion gate along [Runyon Ditch] shall at any time be made except by or through [Los Molinos]." (§ XIV, italics added.)

The decree required the parties to comply with any reasonable rules and regulations implemented by Los Molinos regarding the diversion of water from Mill Creek and Runyon Ditch, subject to orders of the trial court. (§§ X, XIV.) It also authorized Los Molinos, the owners, and their successors to apply to the court for an order defining or revoking Los Molinos's powers and duties or modifying the decree's terms, except no one could seek to modify the terms defining the extent of the parties' water rights or providing for the appointment of a water master. (§ XIII.)

The decree enjoined the parties and their successors from ever taking or attempting to take or divert any water from Mill Creek or Runyon Ditch in excess of what the decree allotted to them. (§ XVIII.) It also enjoined them from asserting any right inconsistent with the decree, interfering with or obstructing any other party's rights under

11

the decree, or from interfering with or obstructing Los Molinos as the water master from carrying out the decree's provisions. (§ XVIII.)

We turn to the District's arguments.

B.  *Using Water Outside of the Irrigation Season*

The trial court ruled the decree prevented the District from using its water outside of the irrigation season. The court noted the decree appointed Los Molinos to apportion water during the irrigation season, gave it the authority to control and superintend the diversions of water only during the irrigation season, and required it to measure flows in Mill Creek and its ditches only during the irrigation season. From these points, the court reasoned: "While Sections VII [entitling the owners to divert and use water 'at all times'] and XIV [requiring Los Molinos to control diversions from Runyon Ditch 'at all times' and ensure it has sufficient water 'at all times'] use the phrase 'at all times,' the Court must construe the Decree as a whole. The Court has considered the entire Decree, not just the individual provisions contained therein; and has interpreted the Decree with the intention of the parties at the time of its entry in mind. The Court determines that the intent of the Decree is to mean 'at all times during the irrigation season' as that phrase is modified and recited in Section X [requiring Los Molinos to apportion water during the 'irrigation season']."

The District contends the trial court's interpretation is incorrect. It claims the interpretation is contrary to the decree's plain language, which in sections III and VII allows owners to use their rights at all times. It also argues the interpretation is inconsistent with the decree's structure. It claims that as constructed, the decree does not suggest one should look to the limitations on the duties of the water master to define the rights of the owners. The District further contends the parties' conduct before this action arose shows the exercise of water rights was not limited to the irrigation season. Los Molinos has delivered water in every month of the year when needed, and other decreed

12

rights to Mill Creek water were used outside of the irrigation season to enhance the creek's salmon and steelhead runs or respond to drought.

We agree with the District that the trial court misinterpreted the decree.

" 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' (*Bank of the West v. Superior Court* [(1992)] 2 Cal.4th [1254,] 1264; see Civ. Code, § 1639.) 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' (*AIU* [*Ins. Co. v. Superior Court* (1990)] 51 Cal.3d [807,] 822; see Civ. Code, § 1639.) 'If contractual language is clear and explicit, it governs.' (*Bank of the West v. Superior Court, supra*, 2 Cal.4th at p. 1264.) ' "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' ([Civ. Code,] § 1644), controls judicial interpretation. (*Id.,* § 1638.)" [Citations.]' (*Waller v. Truck Ins. Exchange, Inc.* [(1995)] 11 Cal.4th [1,] 18.)" (*State of California v. Continental Ins. Co., supra*, 55 Cal.4th at p. 195.)

" 'On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." ([Civ. Code], § 1649; see *AIU Ins. Co. v. Superior Court,* [*supra*,] 51 Cal.3d [at p.] 822.)' (*Bank of the West v. Superior Court,* [*supra*,] 2 Cal.4th [at pp.] 1264-1265.) 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. (Civ. Code, §§ 1635-1656; Code Civ. Proc., §§ 1859-1861, 1864; [citations].)' (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912; see also *People v. Toscano* [(2004) 124 Cal.App.4th 340,] 345.)" (*People v. Shelton* (2006) 37 Cal.4th 759, 767.)

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "[W]here there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.)

The decree grants the owners the right to use their Mill Creek water at any time, subject to one exception. They may divert their water "whenever" water is flowing in the creek. (§ III.) They may divert their shares "at all stages of the flow" and "at all times," and by such means as they see fit. (§§ IV, VII.) They are "at all times entitled to use or dispose" of their shares "in any manner, at any place, or for any purpose . . . or [and this is the exception] in accordance with whatever agreement or arrangement such party may make with any other person or corporation." (§ VII.)

The 1920 decree itself is such an "agreement or arrangement." Each of the parties stipulated to the terms of the decree, and the court entered it as its judgment. Thus, to the extent specific terms in the decree limit the parties' right to use their water, those terms control. "Where two provisions appear to cover the same matter, and are inconsistent, the more specific provision controls over the general provision. (Code Civ. Proc., § 1859.)" (*Starlight Ridge South Homeowners Assn. v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 447.)

Nothing in the decree, however, expressly prohibits owners from diverting or using Mill Creek water outside of the irrigation season. As stated above, the decree imposes limitations on the owners' ability to divert water *during* the irrigation season. During that time of year, only the water master may divert water from Mill Creek for the owners. (§ X.) Also during that time of year, the water master is required to measure regularly the flow in Mill Creek and the amount of water being diverted from the creek. (§ XII.) The owners are subject to the rules and regulations the water master adopts regarding its apportionment of water. (§ X.)

14

But the decree does not expressly limit the owners' actions outside of the irrigation season. There is nothing in the decree that limits the owners' rights to obtain Mill Creek water to only the irrigation season. The water master's office, authority, and responsibilities are as "prescribed and defined" in the decree. (§ X.) And nothing in the decree gives the water master authority to control diversions of water from Mill Creek outside the irrigation season. With no conflicting agreement in place, the owners are free to divert water according to their decreed rights; that is, at any time.

Los Molinos claims the trial court properly limited the District's use of its rights to the irrigation season because under the decree's plain language, the water master enforces the decree, apportions the water, and measures the diverted water only during the irrigation season. As a result, Los Molinos asserts, there are no rights to apportion water outside of that season. If it cannot apportion water, the decree's provisions cannot be met during that time.

Los Molinos's interpretation turns the decree on its head. The ultimate authority to control and exercise the water rights belongs to the owners, not the water master. The water master's authority is to apportion and divert the water as the court and the owners have agreed, not to declare there are no rights to apportion when it is not authorized to divert water. Los Molinos's argument expands its authority beyond what the decree gave it.

That the decree requires Los Molinos to apportion the water during the irrigation season does not mean the owners cannot divert or use the water outside of the irrigation season. The decree grants the owners the right to use their water at any time, limited only by the decree's terms regarding the water master's responsibility during the irrigation season. In fact, the decree sets forth how the owners may obtain water outside of the irrigation season. It expressly grants the owners the right to divert their share of the water "by such means as such party may see fit to adopt, or to procure such quantity of water to be diverted from said river for the benefit of such party under any arrangement

15

with any other person or corporation, or by or through any diversion works constructed or operated by any other person or corporation." (§ VII.)

Los Molinos argues the decree's structure reflects the owners' intent to prohibit diversions outside of the irrigation season. It asserts the decree's first part defines only individual rights to quantities of water, and the second part imposes a collective limitation on when the water could be used by requiring the measurement and apportionment to occur only during the irrigation season and only through the water master.

Los Molinos's understanding of the decree's structure is incorrect. The decree's first part sections I through IX, does more than just allot quantities of water. It also settles and equalizes all competing claims and grants the parties the right to divert and use the water as they see fit. Indeed, the decree prohibits the owners from amending these provisions that define and adjudge the extent of the owners' rights. (§ XIII.)

The decree's second part, sections X through XVII, establishes the water master and defines its responsibilities. In more specific terms than the decree's first part, this part imposes on the water master the duties of diverting the water and measuring the flows during the irrigation season, and operating and maintaining the diversion system of canals, ditches, and gates. These duties conflict with the first part's grant of authority to the owners to divert the water, but only to the extent the owners seek to divert water during the irrigation season. The second part does not conflict with the owners' rights outside of the irrigation season.

Los Molinos argues its and the owners' historical conduct and the District's conduct prior to this action show all parties believed the decreed water rights would exist only during the irrigation season. It claims any deliveries of water it made outside of the normal irrigation season were limited and were only for irrigation purposes. It has never delivered water 365 days of a year.

16

The historical conduct as outlined above shows the owners exercised their water rights primarily during the irrigation season, but it does not show the owners *could not exercise* their rights outside of the irrigation season.

Los Molinos admits there have been times during dry or wet years when the "irrigation season," as Los Molinos defines it, has either expanded or contracted based upon water demands. At times it has delivered water for stock watering as early as January or as late as December. For example, in 2014, an exceptionally dry year, it delivered water for a two-week period in January and February for stock watering and irrigation purposes. It stopped when rains came and enough water had been delivered.

More significantly, Los Molinos's conduct as a water rights *owner* and the conduct of another owner show that at least these owners believe they may control and exercise their rights outside of the irrigation season, even to put their water to a use other than irrigation. Los Molinos has entered into agreements with the state to keep water in Mill Creek it was otherwise entitled to divert for agricultural purposes in order to enhance flows for fish migration, including during times outside of the normal irrigation season. In 1990, the state agreed to provide ground water to Los Molinos in exchange for Los Molinos bypassing an equivalent amount of Mill Creek surface water to support fish migration. In this agreement, Los Molinos also agreed the state could divert and use its water downstream for fish and wildlife purposes. Los Molinos participated in this agreement as a water rights owner; as the water *master*, it only coordinated the releases. It and the state renewed the agreement in 2007. In the 2007 version, Los Molinos specified it would release its water in the spring and also from October 15 through November 30.

In 1996, Jones, Inc., a landowner within Los Molinos's service area and an owner of water rights, agreed to forgo any deliveries of its water throughout the year so the water could be used to aid fish migration in Mill Creek. Los Molinos agreed to add this water to the amount it previously agreed to bypass under the 1990 agreement. Also in

17

this 1996 agreement, Los Molinos agreed to bypass an additional 10 cfs of its Mill Creek water from October 15 through December 31. This agreement was valid for 11 years.

In 2008, The Nature Conservancy purchased water rights from Jones, Inc. It continues to bypass its share of water in the spring and from October 15 to November 30 to support fish migration. Los Molinos also continues to bypass its additional 10 cfs of water.

During the drought year of 2014, Los Molinos and The Nature Conservancy entered into agreements with the state to bypass water which was otherwise available for agricultural use from October 15 through December 31 of that year to support fish migration.

These bypass agreements show Los Molinos interprets the decree to give it, as an owner of water rights, the authority to access and direct the use of its appropriated water outside of the irrigation season. This is consistent with the express language of the decree entitling the owners to divert and use their water at any time, and is the same right the District seeks to exercise.

Los Molinos asserts these agreements merely require it to operate its dams in a certain manner; they are not claims of water rights outside the irrigation season. That assertion is not correct. By these agreements, Los Molinos controlled and exercised its water rights outside of the irrigation seasons. It admitted it exercised these rights as an owner, not as the water master.

The decree's express language, as well as its structure and historical implementation, lead us to conclude the District is authorized to divert its water outside of the irrigation season.

C.      *Using Water Outside of Los Molinos's Service Area*

The District sought a declaration that the decree did not prohibit it from using its water outside of the Mill Creek watershed. Although the trial court noted the decree

authorized owners to use their Mill Creek water "at any place, or for any purpose," it ruled the decree prevented the District from diverting water outside the basin unless it or Los Molinos approve it.

The court relied on provisions in the decree it believed showed that the original owners and the superior court contemplated diversions only *from* Mill Creek, not diversions of Mill Creek water from another waterway or location downstream. Section VII authorized the parties to divert "*from said river*" their allotments "at such point or points *on said river*, as such party may see fit . . . ." (§ VII, italics added.) The same section declared the diversion rights given to the parties included whatever water the parties were entitled "to divert from *said rive*r by virtue of owning land riparian thereto . . . ." (*Ibid.*, italics added.) Each party is entitled to use or dispose of its share "of the water of *said river* . . . ." (*Ibid.*, italics added.) These provisions led the court to state the decree did not authorize an owner to move the diversion point to some location not on Mill Creek.

The trial court set forth additional reasons for its interpretation. It said if water was diverted at a location outside of Mill Creek, the water master could not enforce the decree's terms. The decree's section X gives the water master authority during the irrigation season to enter upon the lands of the owners on which there is a canal, gate, or other structure used for conveying water in order to control all diversions "from said river" and the placement and operation of gates and measurement devices that are used for "such diversions of water from said river . . . ." (§ X.) The court said the water master had neither the ability nor the authority to travel to locations outside its system to install measuring devices to ensure the transferee of the District's water rights was diverting the proper amount of water. The court believed conveying water outside the system would render the water master impotent.

The court also indicated that transferring the water out of the Mill Creek basin would harm other users. The decree adjudged both appropriative rights and riparian

19

rights. Riparian rights, however, could not be transferred apart from the riparian land. The court said the District moving its rights out of the watershed would be inconsistent with riparian rights and result in harm to others.

The trial court believed that interpreting the decree to allow an owner to use water outside of the service area would create an absurdity. It explained: "The intended purpose of the Decree was to allocate water among the various parties. If the Water Master or the Court would now permit the transfer of this scarce resource out of the basin when the system barely functions because of the short water supply, the system would become compromised and conflicts would arise. 'The court shall avoid an interpretation which will make a contract extraordinary, harsh, unjust, inequitable or which would result in absurdity.' [Citations.] [¶] The Court finds that the Decree does not empower all water right holders to use their water at any place."

The District claims the trial court interpreted the decree incorrectly for a number of reasons. The decree expressly authorizes the District to use its share of the water allotted to it "in any manner, at any place, or for any purpose . . . ." (§ VII.) Nowhere does the decree limit water use to the creek's watershed or Los Molinos's service area.

The District also faults the trial court for finding a risk of harm to other owners when the District has yet to propose a specific diversion or use. The stipulated facts did not specify a particular change of use or allege a specific injury. Also, the court found a change of use would result in conflicts over an inadequate delivery system without citing to evidence of any specific injury. Because the case was not an adjudication of a specific change of use, the District claims the court's finding of injury is premature.

The District claims the parties' conduct shows that water is used outside of the Mill Creek watershed regularly. Most of Los Molinos's northern service area is outside of the creek's watershed. Also, Los Molinos agreed that as part of the 1990 and 2007 bypass agreements, the bypassed water could be used by the state and diverted downstream after it reached the Sacramento River, outside of Los Molinos's service area.

20

The District further argues the trial court's concern with possible injury to riparian rights is unfounded. The parties to the decree agreed to a single set of rules to govern both riparian and decreed rights, allocating each party a share of the flow and expressly eliminating any priority of riparian rights over decreed rights.

We note that the parties argue over whether the issue is the right to use water outside of the Mill Creek watershed or Los Molinos's service area. Because the service area may include areas both inside and outside of the watershed, we focus on the right to use water outside of the service area.

We agree with the District that the trial court's interpretation of the decree is incorrect.

The decree expressly authorizes each water rights owner to use its share of the water allotted to it "in any manner, at any place, or for any purpose" or according to whatever agreement it enters into with others. (§ VII.) Nowhere does the decree limit water use to the creek's watershed or Los Molinos's service area.

The decree's provisions regarding where the water can be diverted do not change the District's right to choose where the water will be used. In 1920, "it had long been the law of California (as it still is today) 'that the person entitled to the use of water may change the place of diversion, or the place where it is used, or the use to which it was first applied, if others are not injured by such change.' (*Ramelli v. Irish* (1892) 96 Cal. 214, 217; see generally Hutchins, The California Law of Water Rights [(1956)] p. 177 [change in place of use].)" *(Barnes v. Hussa* (2006) 136 Cal.App.4th 1358, 1367-1368.) Water Code section 1706 and its predecessor statute codified this rule.[1] Accordingly, although

---

[1]    Water Code section 1706 states: "The person entitled to the use of water by virtue of an appropriation other than under the Water Commission Act or this code may change the point of diversion, place of use, or purpose of use if others are not injured by such change, and may extend the ditch, flume, pipe, or aqueduct by which the diversion is made to places beyond that where the first use was made." (Wat. Code, § 1706.)

the decree contemplated the water would be diverted only from Mill Creek, the law allows the District to use the water elsewhere if it can do so without injuring the rights of others to the water. (*Id.* at p. 1369.)

Even if the water can be diverted only from Mill Creek, nothing in the decree stops an owner from using the water elsewhere after it has been diverted. An owner could construct a means to convey the water from the point of diversion on Mill Creek to the water's eventual place of use. The diversion requirement does not compel an owner to use its water only within Los Molinos's service area.

Contrary to the trial court's reasoning and Los Molinos's argument, allowing an owner to use its water outside of Los Molinos's service area does not thwart the water master from performing its duties and enforcing the decree. Whether an owner leaves its water in the creek to be diverted downstream or conveys it somewhere after Los Molinos diverts it, Los Molinos can still measure the water to ensure the owner does not receive more than its allotted share. It need only calculate the proper allocation and either leave that amount in the creek or superintend the appropriated amount through its system of canals and ditches to the owner's property or conveyance system, where it can measure the volume delivered. Nothing requires it to follow the water outside of its service area. Under either circumstance, it is able to ensure the owner diverts no more than its allotted share.

The trial court's finding of harm was speculation. No facts of any actual transfer were before the court from which it could find injury would occur. The trial called only for a legal interpretation of the decree. Of course, an actual transfer of rights by the District must not harm any other legal user (Wat. Code, § 1706), but such a determination cannot be made where no transfer is proposed.

Los Molinos contends the trial court's interpretation correctly protects riparian rights. If the court treated the riparian rights as appropriative and freely transferable, it could give riparian right holders the authority to transfer their rights even though riparian

22

rights are annexed to the land. Los Molinos asserts that the District argues the decree effectively created new, undefined rights.

Los Molinos's argument is a red herring in at least three respects. First, the transferability of riparian rights is not before us. The District's water rights are appropriative, not riparian. Whether the decree's authorization to use the water at any place was intended to vest in riparian owners a right to transfer their water rights apart from their riparian land is a question we need not decide in order to determine as an abstract question of interpretation whether owners of appropriative rights may use their water in any place.

Second, as already stated, Water Code section 1706 provides that owners of appropriative rights may change the place of diversion even though riparian owners may not. (Wat. Code, § 1706.) No court has interpreted that statute to require riparian rights also to be transferable.

Third, the riparian owners under the decree have no priority of right. The decree expressly equalized the owners' rights to the water and eliminated any priority riparian owners may have had to it under common law. Thus, in the abstract, an owner's riparian rights do not prevent the District from using its water outside of Los Molinos's service area.

Los Molinos further claims the conduct of the parties supports the trial court's interpretation. Mill Creek water has always been diverted only from Mill Creek and, while not all of it may be used within the creek's watershed, all of it has been diverted and used within Los Molinos's service area. Moreover, Los Molinos's use of Mill Creek water to enhance fish migration is a use of water within the creek's watershed to benefit fishery resources in Mill Creek. Los Molinos argues whether downstream users gain an incidental benefit is beside the point.

Los Molinos ignores the decree's language. Water diverted from Mill Creek may be used anywhere. The historical use of water within Los Molinos's service area does

not alter the decree's express and unambiguous terms. And although the diversion of Los Molinos's water downstream may be an "incidental benefit," it nonetheless was a benefit Los Molinos contractually conferred on a downstream user, which is the same right the District seeks to exercise. The District is entitled to use its water outside of the service area.

D.  *Prior Approval by Los Molinos or the Superior Court*

The trial court held any change of use or the place of use required prior approval by the court or the water master. The court based its conclusion on the operation of Water Code section 1706 in light of the water master's control of diversions under the decree. The court reasoned: "If Water Code section 1706 applies and riparian rights are excluded within the application of this section, then the Water Master has total control over diversions from Mill Creek and the Runyon ditch," as indicated by the decree's terms granting the water master control over diversions during the irrigation season. The court ruled that because the water master has total control, and because the decree does not authorize year-round diversions or out-of-basin transfers, any change to the purpose or place of using Mill Creek water required prior approval.

The District contends the trial court erred in its interpretation. It claims the decree does not require an owner, either expressly or by implication, to obtain the water master's or the court's approval before changing the place or purpose of using its water. The water master in effect serves a ministerial function of allocating waters according to the terms of the decree.

The District argues that even if the water master had discretion to determine whether an owner's proposed change injured another party, the change would be presumed to be noninjurious and would not become wrongful until a party was injured, and the injured party would have the burden of proving the injury.

24

Moreover, the owners have made changes to their use of water without seeking prior approval. Neither Los Molinos, Jones, Inc., nor The Nature Conservancy sought prior approval from Los Molinos or the court before changing the use of their water from irrigation to fish enhancement.

We agree with the District that the trial court's holding is incorrect. The court created a condition that does not exist in the decree, and it did so based on a misunderstanding of the extent of control the decree grants to Los Molinos and of the operation of Water Code section 1706.

Nothing in the decree subjects changes to use or location to the water master's or court's prior approval. Los Molinos's authority is as "prescribed and defined" in the decree (§ X) and nowhere does the decree prescribe or define any authority by Los Molinos to approve a proposed change in the use, location, or point of diversion. The decree vests the superior court with continuing jurisdiction, but the court's continuing authority is limited to addressing petitions by the water master or rights owners to define the water master's power, replace the water master, or modify any provision of the decree except those that establish the owners' water rights. (§ XIII.) The decree does not authorize the court to exercise its continuing jurisdiction over an owner's decision to change its use or location of using the water.

The trial court implied the water master had authority to approve changes in use because it controls the apportionment and delivery system. The effect of the court's ruling, however, is to vest authority over an owner's water right in the water master. The owners gave the water master limited authority to control diversions during the irrigation season and to control the system of canals and ditches the water master uses to deliver the water according to the terms of the decree. The owners did not vest in the water master the authority to control the water right or the discretion to determine where, how, or in what manner an owner exercised its water right. The water rights belong to the owners, not the water master.

25

Moreover, Water Code section 1706 does not provide the water master with the discretion it seeks. The trial court interpreted the statute to place the burden on the District to establish a proposed change will not injure other owners before making the change, but this misreads the statue. Nothing in the statute requires a water rights owner to seek prior approval before changing its use. Indeed, this court had held that a party who claims another party's change of use injures its right to water bears the burden of proving the injury. (*Barnes v. Hussa, supra*, 136 Cal.App.4th at pp. 1365-1366.) Owners of pre-1914 appropriative rights are entitled to proceed with a change of use, location, or point of diversion until the change is enjoined. (Slater, Cal. Water Law & Policy (2011) § 2.26, p. 2-121.)

Los Molinos argues the District has not cited any provisions in the decree that give the owners any retained authority to do anything it may not. If, Los Molinos contends, the decree does not give it the authority to deny changes it believes are inconsistent with the decree or would impair its obligations, then this ability "must have been given to the Decreed water users," but no such provision exists in the decree. Instead, the decree enjoins the owners from interfering with any other owner's rights or the water master's work in carrying out the decree. Because the owner's "privileges" must yield to this injunction, Los Molinos contends it has the ability to prevent the exercise of that "privilege."

Los Molinos's argument is not persuasive. Nothing in the injunction contained in the decree expressly or implicitly gives Los Molinos the authority to approve or deny proposed changes of use. Under the decree and Water Code section 1706, Los Molinos and the other parties to the decree may seek to enjoin a change upon a showing of injury. But nothing in the decree or the law requires the District to obtain approval from Los Molinos or the superior court before changing its use or location of using its water.

## II

### *Appeal from Attorney Fee Award*

Because we reverse the trial court's judgment denying the District's requests for declaratory relief, we must reverse the attorney fee award premised upon Los Molinos being the successful party in the judgment. (See *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 978-979 [reversing attorney fee award under Code of Civil Procedure section 1021.5 premised on the parties prevailing on the judgment reversed].)

### DISPOSITION

The judgment denying declaratory relief and the order awarding attorney fees are reversed. Costs on appeal are awarded to the District. (Cal. Rules of Court, rule 8.278(a).)


      HULL      , Acting P. J.


We concur:


      BUTZ      , J.


      RENNER      , J.