Filed 3/12/24  Chino Basin Municipal Water District v. City of Chino CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| CHINO BASIN MUNICIPAL WATER DISTRICT, | |
| Plaintiff, | E079052 |
| v. | (Super.Ct.No. RCVRS51010) |
| CITY OF CHINO, et al., | OPINION |
| Defendants and Appellants; | |
| CHINO BASIN APPROPRIATIVE POOL, et al., | |
| Defendants and Respondents; | |
| CHINO BASIN WATERMASTER, | |
| Objector and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Stanford E. Reichert, Judge.  Affirmed.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Michael D. Campion and Conor W. Harkins, for Defendant and Appellant City of Chino.

Nossaman, Frederic A. Fudacz, Jennifer L. Meeker and Gina R. Nicholls, for Defendants and Appellants, City of Ontario, Monte Vista Water District and Monte Vista Irrigation Company.

Horvitz & Levy, Lisa Perrochet, Mitchell C. Tilner; and John J. Schatz for Defendant and Respondent, Appropriative Pool.

Egoscue Law Group, Tracy J. Egoscue and Tarren A. Torres, for Defendant and Respondent, Chino Basin Overlying (Agricultural) Pool Committee.

Brownstein Hyatt Farber Schreck, Scott S. Slater, Bradley J. Herrema, Matthew L. Hofer and Laura K. Yraceburu, for Objector and Respondent, Chino Basin Watermaster.

In 1978, defendants and appellants City of Chino (Chino), City of Ontario (Ontario), Monte Vista Water District and Monte Vista Irrigation Company (collectively, Monte Vista), along with several other parties, stipulated to a judgment (Judgment), which manages competing water rights in the Chino Groundwater Basin (Basin). The Judgment established the Basin's governance structure, provided judicial oversight via continuing jurisdiction provisions, and created the Watermaster. The Judgment further organized the parties into three "Pools" (Overlying (Agricultural or Ag) Pool, Overlying (Non-agricultural or Non-Ag) Pool, and Appropriative (Ap or App) Pool) to administer and allocate responsibility for various aspects of the Judgment and the adopted physical solution to groundwater management. Appellants are members of the Ap Pool.

In 2000, the Ap Pool and the Ag Pool executed the Peace Agreement (sometimes referred to as the Agreement) which governs, *inter alia*, responsibility for certain Basin-related expenses. Subsequently, a dispute arose between these two Pools over the extent

2

of the Ap Pool's obligation to pay for the Ag Pool's legal expenses. Following the Ag Pool's unsuccessful attempt to obtain a court order requiring the Ap Pool to pay, appellants filed motions seeking reimbursement of the legal expenses paid for fiscal years 2019-2020 and 2020-2021. Simultaneously, the Pools sought resolution of their dispute, and over appellants' objection, they entered into a settlement agreement (Terms of Agreement or TOA) which committed the Ap Pool members to pay a portion of the legal expenses they were contesting. Appellants' motions were heard on April 22, 2022; the superior court denied them as moot based on the TOA. The court found that the Pools had authority under the Judgment to settle their inter-Pool disputes (here through the TOA) and appellants are bound by the Pools' action.

On appeal, appellants challenge the superior court's denial of their reimbursement motions via separate briefing. Ontario and Monte Vista contend the "central question in this appeal is whether a committee of parties with appropriative water rights formed under the Judgment, specifically, the [Ap Pool], holds the power to bind individual members of the [Ap Pool] to a contract without the consent or approval of the parties purportedly bound." In particular, they argue the court erred by (1) determining the TOA moots the monetary claims asserted by individual appellants, and (2) misreading the Judgment and Peace Agreement. Separately, Chino contends the court's order "holds Chino to an implied contract forbidden by controlling authority, established by unspecified evidence." It argues this appeal raises a question of law, namely, whether the court "properly conclude[d] a majority of the [Ap Pool] Committee could settle Chino's [reimbursement] motion over Chino's objections."

3

As we explain, we conclude the superior court correctly interpreted the Judgment and the Peace Agreement in denying appellants' motions for reimbursement on the grounds the TOA resolved the dispute between the two Pools.

## I.  PROCEDURAL BACKGROUND AND FACTS

In 1975, Chino Basin Municipal Water District (CBMWD) initiated this action against several parties to adjudicate their rights and obligations with respect to groundwater in the Basin.  Three years later, the parties stipulated to the Judgment which established a "physical solution" and allowed the superior court to retain and exercise jurisdiction.  The Judgment, including all amendments, was restated and reentered in 2012; this restated judgment is "the official and legally operative copy of the Judgment in [this] case."[1]  Appellants are signatories to the Judgment.

The Judgment established the rights of three "Pools" of parties with water interests in the Basin:  They include (1) the Ag Pool (the State of California and all overlying producers who produce water for other than industrial or commercial purposes); (2) the Non-Ag Pool (overlying producers who produce water for industrial or commercial purposes); and (3) the Ap Pool (owners of appropriative water rights not appurtenant to land ownership, principally public entities and water companies who pump water for municipal customer uses).  Each Pool has a committee that administers its internal affairs, employs its own separate counsel, may seek judicial review of any Watermaster action or

_____

[1]  Unless otherwise indicated, all further references and citations to the judgment are to the 2012 restated judgment.

4

failure to act, and—along with an Advisory Committee—provides advice and assistance to Watermaster on the administration of the Judgment. Each Pool has a Pooling Plan that controls its respective operations. Under the Ap Pool's Pooling Plan, "[a]ffirmative action of the [Pool] Committee shall require a majority of the voting power of members in attendance, provided that it includes concurrence by at least one-third of its total members."[2]

Watermaster administers and enforces the Judgment and any subsequent instructions or orders of the superior court. Watermaster is authorized to assess the Pools for its general administrative expenses, as defined, and to assess a specific Pool for its special project expenses, as defined, if certain conditions are satisfied. Initially, plaintiff CBMWD was appointed as Watermaster; however, in 1998, the superior court replaced CBMWD with a nine-member Board, comprised of representatives of the parties to the Judgment, including at least one representative from each Pool. Also in 1998, the court directed Watermaster to prepare an Optimum Basin Management Program (OBMP) to address water quality issues.

The OBMP was divided into two phases: Phase I (the report) was adopted in 1999, and Phase II (implementation plan) was submitted to the court for approval in 2000. The OBMP was subject to intensive settlement negotiations that led to various

---

[2] The "voting power" of the Pool Committee consists of 1,000 total votes. Of that total, 500 votes are allocated to members proportionally to their percentage shares in the Basin's water, as specified elsewhere in the Judgment, and 500 votes are allocated to members "proportionally on the basis of assessments paid to Watermaster during the preceding year." "Action by affirmative vote of a majority of the entire voting power of any Pool Committee . . . shall constitute action by such committee."

parties to the Judgment (including appellants) executing the Peace Agreement in June 2000. The Peace Agreement resolved the parties' disputes regarding "a number of matters pertaining to the power and authority of the Court and Watermaster under the Judgment . . . ." It addresses implementation of the OBMP for the Basin and allows Watermaster to administer transfers, recharge, and storage/recovery of water. On July 13, 2000, the superior court accepted the Peace Agreement and ordered Watermaster to proceed in accordance with its terms.

To avoid overtaxing the Basin, the Judgment set its initial safe yield at 140,000 acre-feet per year (AFY). The "safe yield" is "'the maximum quantity of water which can be withdrawn annually from a ground water supply under a given set of conditions without causing an undesirable result.' The phrase 'undesirable result' is understood to refer to a gradual lowering of the ground water levels resulting eventually in depletion of the supply." (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 278, disapproved on other grounds in *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1248.) In 2017, the superior court reset it to 135,000 AFY.

Pursuant to the Judgment, unproduced Ag Pool water is made available for reallocation to members of the Ap Pool on a five-year schedule. According to Traci Stewart, a former Chief of Watermaster Services for the Basin, the Peace Agreement accelerated this schedule by making unproduced Ag Pool water available for reallocation to members of the Ap Pool on an annual basis (Early Transfer). Because members of the Ap Pool are only entitled to share in the remaining safe yield of water after satisfaction of overlying rights and the rights of the State of California, a reduction in the safe yield

6

means a reduction only in the remaining share of the safe yield of water that the members of the Ap Pool are entitled to. The Early Transfer of the Ag Pool's unproduced share of safe yield is an economic benefit to the Ap Pool and the consideration for its agreement to pay the Ag Pool's expenses. This arrangement was formalized in the Peace Agreement.

Significant to the issue presented in this appeal is the language in section 5.4(a) of the Peace Agreement wherein the Ap Pool agrees to pay "all assessments and expenses of the Agricultural Pool Committee . . .[, including but not] limited to OBMP Assessments, assessments pursuant to Paragraphs 20, 21, 22, 30, 42, 51, 53, 54 both General Administrative Expenses and Special Project Expenses, 55, and Exhibit F (Overlying Agricultural Pool Pooling Plan) of the Judgment. . . ."[3] Stewart explains this language formalized the Ap Pool's practice of paying the Ag Pool's assessments and expenses,

---

[3] This same language was the subject of a prior dispute that was resolved via a Special Joint Pool Committee. According to that resolution, documented in the 2009 Memorandum of the Joint Special Pool Committee (the "2009 Memo"), "[T]he Agricultural Pool agrees to participate in the regular Watermaster Budget Process and present an annual budget in the same form and fashion as the other Pools. This will include: legal fees, consultant fees, meeting fees and projects. All of the budgets will be reviewed through the Pool process, approved and submitted by the Advisory Committee to the Watermaster. [¶] Only Watermaster is authorized to undertake Special Project expense under Judgment Section 54 and Section 27. Such expense can only be allocated to a specific Pool if the Pool agrees or the court so orders, but this is not an authorization for the Pool to undertake such expense on its own initiative. (See e.g. Judgment section 54 and Peace Agreement Section 5.4(a).) Under Section 38 (a) Pool Committees are limited to 'developing policy recommendations for administration of its particular Pool.' Special Project expense necessarily must be part of the Physical Solution which is under the control of the Court and its Court appointed Watermaster. While the Pool Committees are there to provide advice and assistance to Watermaster they may not supplant Watermaster's Physical Solution authority under Section 41."

including legal fees. According to Joseph S. Joswiak, Watermaster's Chief Financial Officer, this practice continued uninterrupted and without controversy, and the Ap Pool members—including appellants—were assessed to cover those costs.

Between 2010 and 2017, the Ag Pool's annual legal expenses never exceeded $300,000; however, for fiscal year 2019-2020, its expenses increased to $529,009. In September 2020, the Ag Pool increased its 2020-2021 budget for legal expenses to $500,000. This increase prompted certain Ap Pool members, including appellants, to file a motion seeking a judicial determination to limit the expenses the Ap Pool will be required to pay on behalf of the Ag Pool under the Peace Agreement. The moving parties also sought a refund of legal expenses previously paid relating to an action initiated by the Ag Pool to challenge certain Ap Pool members' applications for local water storage (Storage Contests).

On May 28, 2021, the superior court ruled that section 5.4(a) of the Peace Agreement does not obligate the Ap Pool to pay unlimited Ag Pool expenses "without knowledge of the nature of the expenses." Instead, the court established a default procedure (when the parties could not agree on the payment of the legal expenses) that the Ag Pool had to follow to recoup its legal expenses. Specifically, the Ag Pool had to demonstrate the legal expenses incurred were for services that benefitted it and were not adverse to the Ap Pool, and the Ag Pool could not redact its attorney's bills so as to make them meaningless for review by opposing counsel and determination by the court. The May 28, 2021 order did not rule out settlement as another procedure or method of accomplishing payment of the Ag Pool's legal expenses. Further, the court deferred

8

ruling on the moving parties' claim for refund of Storage Contests payments to allow the Ag Pool the opportunity to seek recovery of those expenses using the sanctioned legal procedure.

Subsequently, principals of both the Ag Pool and the Ap Pool held a series of five meetings wherein they were unsuccessful in resolving the Ag Pool's request for payment of its legal expenses. Thus, in August 2021, the Ag Pool filed a motion to require the Ap Pool to reimburse the Ag Pool's legal expenses exceeding $563,000.[4] Appellants and other Ap Pool members opposed the motion, arguing it failed to comply with the requirements set forth by the superior court. They also sought reimbursement of $746,830 previously paid in the preceding two fiscal years. The Ag Pool's motion was denied on December 3, 2021, on the grounds it had not satisfied the default procedure established by the May 2021 order. Also, the court authorized Chino to file "a motion as to the procedure for reimbursement of any assessments . . . that may be due to the paying party." The Ag Pool appealed the court's order.

In January 2022, appellants (separately) moved for reimbursement of $483,202.55 in legal expenses the Ap Pool paid to the Ag Pool in fiscal years 2019-2020 and 2020-2021 (reimbursement motion). Appellants argued the conditions established in the May

---

[4] The Ag Pool claimed the Ap Pool was required to pay legal expenses of $460,723.63 directly to the Ag Pool and $102,557.12 to the Watermaster Administrative Reserve Account (the fees related to the Storage Contests incurred in fiscal year 2020-2021). According to Robert Feenstra, chair of the Ag Pool, the increase in the Ag Pool's legal fees started in 2014 and was a "direct result of the actions of the [Ap] Pool that were adverse to the Basin and Watermaster's efforts towards safe Basin management – starting with the Safe Yield Reset process in 2014."

2021 order applied retroactively and the Ag Pool had not satisfied them in fiscal years 2019-2020 and 2020-2021. Also, appellants asserted the Ag Pool should reimburse Watermaster the sum of $102,557.12 that it advanced in fiscal year 2020-2021 for the Ag Pool's legal expenses. In response, the Ag Pool argued appellants have waived, or were estopped to assert, any right to reimbursement of legal expenses previously paid without objection or reservation. The Ap Pool also weighed in to indicate it supported the superior court's determination of the issues raised by appellants. Watermaster's reply sought "to clarify and provide context to certain issues raised" to assist the court in reaching a ruling.

Before the superior court could hear the appellants' motions, principals of the Ap Pool and the Ag Pool reached a settlement, the TOA. A majority of the Ap Pool's voting power (59.363%) approved the TOA, which was signed by the Ap Pool's chair. According to the TOA, the two Pools agreed to abide by the court's May 2021 order imposing conditions on the Ag Pool's right to recoup legal expenses. Toward that end, the Ag Pool agreed to submit all attorney's invoices for which it sought payment to Watermaster in a form that would allow the Ap Pool to determine whether the invoiced expenses benefitted the Ag Pool and were not adverse to the Ap Pool. The Ag Pool also agreed (1) to dismiss its appeal from the December 3, 2021 order denying its motion for legal expenses (case No. E078377), and (2) to dismiss its Storage Contests. In return, the Ap Pool agreed—as authorized by a majority vote of its members—to pay the Ag Pool $370,000 as a compromise of the disputed legal expenses. The Ag Pool would, in turn, use some of that money to repay Watermaster the disputed $102,557.12 previously

10

advanced from its administrative reserves. The Ag Pool's agreement to repay that sum was one of the principal demands in appellants' motion. The Ap Pool also agreed to pay specified Ag Pool expenses from fiscal year 2021-2022 through the end of the initial 30-year term of the Peace Agreement.

On March 24, 2022, representatives of the two settling Pools submitted the "Joint Statement Regarding Settlement Agreement Between Appropriative Pool and Agricultural Pool Regarding Peace Agreement 5.4(a)," which notified the superior court of the settlement and included a copy of the TOA. At the court's request, the settling Pools refiled the document on April 11, 2022. All interested parties thereafter filed supplemental briefs, along with supporting declarations, addressing the impact of the TOA on appellants' pending motion and related issues. Watermaster's general manager, Peter Kavounas, declared that each Pool "has acted in a representative capacity in accordance with its respective Pooling plan, where it has been necessary or convenient." Examples of the type of Pool activity sanctioned via representative capacity include: retention of legal counsel and direction to Watermaster in the proper way to invoice members for paying such counsel, direction on the manner in which members fund recharge improvement projects, and entering into agreements with other Pools or parties to the Judgment.

On April 22, 2022, the superior court denied appellants' reimbursement motions on multiple grounds, including (1) the TOA settlement is valid; (2) the doctrines of waiver and laches apply because the Ap Pool previously paid the Ag Pool's legal expenses without objection; and (3) there is an implied-in-fact contract under which the

11

Ap Pool members agreed to be bound by a majority decision of the voting power. On appeal, appellants challenge the court's denial of their motions, along with its finding that they are bound by the TOA.

## II. DISCUSSION

According to appellants, the superior court's April 2022 order approving the TOA gives power to other groundwater appropriators, and carte blanche authority to the Ap Pool, to impose its agreements on public entities and to spend their ratepayers' money. They contend the TOA is not valid and binding on all members of the Ap Pool because (1) the Ap Pool lacked authority to execute the TOA, and (2) the TOA is inconsistent with the Judgment, the Peace Agreement, and the court's May 28 and December 3, 2021 orders. Appellants further assert the court's affirmance of the TOA holds them to an implied contract forbidden by controlling authority. We are not persuaded.

### A. *The Ap Pool was Authorized to Execute the TOA.*

Citing the Judgment, appellants maintain the functions of the Pools are limited to advising and assisting Watermaster in the "administration of, and for the allocation of responsibility for, and payment of, costs of replenishment water and other aspects of [the] Physical Solution." They add the Judgment incorporates a "pooling plan" for each Pool which controls the Pool's operations and may be modified only by amending the Judgment "pursuant to the Court's continuing jurisdiction." Accordingly, appellants argue the Ap Pool is not authorized to usurp the power and authority held by individual members—such as government entities—and enter into contracts such as the TOA.

12

*1.  The Judgment establishes a collective decision-making governance structure.*

"When interpreting the stipulated judgment, we use ordinary contract principles and, in the absence of extrinsic evidence, we may interpret it as a matter of law. [Citation.]"  (*Needelman v. DeWolf Realty Co., Inc*. (2015) 239 Cal.App.4th 750, 758.) "'[T]he primary object of all interpretation is to ascertain and carry out the intention of the parties.'"  (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238.)

Here the Judgment directs Watermaster to "cause committees of producer representatives to be organized to act as Pool Committees for each of the several pools created under the Physical Solution."  Paragraph 43 established three separate Pools as entities with rights and obligations separate from their members.  Each Pool has a committee of representatives (the Pool Committee) that acts on its behalf.  Contrary to appellants' assertion, the functions of the Pool Committees are not limited to "developing policy **recommendations** for administration of its particular pool," seeking trial court orders, challenging Watermaster action, and employing counsel for litigation.  Rather, they include the power to take action.  (See *Robings v. Santa Monica Mountains Conservancy* (2010) 188 Cal.App.4th 952, 964 ["in the absence of express restrictions, implied powers may arise as well from the purposes for which the agency was created"]; see also *id*. at p. 966 [affirming trial court finding that recognized entity's status is separate from its constituent members].)  Paragraph 38(a) of the Judgment provides, "*All actions* and recommendations *of any Pool Committee which require Watermaster implementation* shall first be noticed to the other two pools."

13

Additionally, Pool Committees pay Watermaster's assessments of the costs of water replenishment or supplementation. According to paragraph 54, the expenses of administration of the physical solution are categorized as either general Watermaster administrative expenses, or special project expenses. Special project expenses include *litigation expenses* and must "be allocated to a specific pool, or any portion thereof, only upon the basis of prior express assent and finding of benefit by the Pool Committee, or pursuant to written order of the Court." As the Ap Pool notes, the Judgment granted each Pool a measure of control over its obligation to pay litigation expenses incurred by other Pools or Watermaster (see paragraph 54(b)), the power and responsibility to pay the costs of replenishment water and other enumerated expenses (see paragraph 43), and the power to seek judicial review (see paragraph 15).

Pool Committees are composed as specified in their respective pooling plans, which also dictate their voting power; each Pool's pooling plan is attached to the Judgment. According to paragraph 35, "[a] majority of the voting power" of a Pool Committee constitutes a quorum for transaction of the Pool Committee's affairs, and "[a]ction by affirmative vote of a majority of the entire voting power of any Pool Committee or the Advisory Committee shall constitute action by such committee." Moreover, "[a]ny action . . . of a Pool Committee . . . shall be transmitted to Watermaster in writing, together with a report of any dissenting vote or opinion."

As relevant here, the pooling plan for the Ap Pool authorizes the Ap Pool Committee to take action on behalf of its members pursuant to a "majority of the voting power of members in attendance, provided that it includes concurrence by at least one-

14

third of its total members." By agreeing to the Judgment, members of each Pool accepted the possibility that implementation of the OBMP through the collective decision-making of their Pool may result in taking action they (individually) do not support. As the superior court observed, "chaos would ensue" if the Pools employed a decision-making process untethered to the majority rule voting system.

Similarly, the Peace Agreement acknowledged and affirmed the Ap Pool's power to resolve disputes over the Pool's obligations via a majority vote. In executing the Agreement, appellants stated their desire "to resolve issues by consent under [its] express terms and conditions." Section 1.1(gg) defines "[p]arty or [p]arties" as a party to the Judgment and/or a party to the Agreement; appellants are parties to the Judgment, and Chino, Ontario, Monte Vista Water District, and the Ap Pool are parties to the Agreement. Section 1.2(a)(v) defines "includes" and "including" as *not limiting*." Section 5.4(a) identifies the Ap Pool as the sole party responsible for paying the Ag Pool's expenses: "During the term of this Agreement, all assessments and expenses of the Agricultural Pool including those of the Agricultural Pool Committee *shall be paid by the Appropriative Pool*." Because section 5.4(a) did not specify any other payor, the superior court correctly concluded that the "App Pool, qua pool," bore the obligation. Also, section 8.4 provides the Ap or Ag Pool "(as a Pool only and not the individual members of either Pool)" each with the unilateral right to extend the term of the Peace Agreement for an additional 30 years, prior to the end of the 25th year. Consequently, the Ap Pool possessed the authority, with a majority of its members' consent, to take action such as extending the term of the Agreement or resolving disputes over its

15

contractual obligations, including payment of the Ag Pool's legal expenses. Such resolution could be via non-binding mediation or settlement negotiations. (*Robings v. Santa Monica Mountains Conservancy*, *supra*, 188 Cal.App.4th at p. 964 ["in the absence of express restrictions, implied powers may arise as well from the purposes for which the agency was created"].)

In short, the governance structure embodied within the Judgment, coupled with the Peace Agreement, enables administration of the Judgment through collective decision making by each Pool.

2. *The Pools' longstanding practice recognized their ability to take binding representative action.*

For more than 40 years, the Pools have taken actions in a representative capacity on behalf of their members. Watermaster notes the following examples of such actions: (1) retaining of counsel and consultants; (2) directing Watermaster in the proper way to invoice Pool members for paying legal counsel; (3) directing refinancing of Watermaster debt; (4) determining of manner in which members fund groundwater recharge improvement projects in the Basin; (5) determining representatives on the Advisory Committee and Watermaster Board; (6) appealing superior court orders; and (7) initiating storage contests. The parties' conduct and extensive course of dealing clarify any uncertainty in whether the Pools may act in a representative capacity. (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1202-1203 ["assuming plaintiffs have tendered an ambiguity regarding allocation of the proceeds or value of system power pool sales or trades, the

16

long course of dealing between the parties clarifies that ambiguity against them"]; *Orange Cove Irrigation Dist. v. Los Molinos Mutual Water Co*. (2018) 30 Cal.App.5th 1, 12-13 ["'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.'"]; see *Moreno Mutual Irrigation Co. v. Beaumont Irrigation Dist.* (1949) 94 Cal.App.2d 766, 783-784 [passage of time and course of dealing bar subsequent assertion of public policy and constitutional claims under a contract for stipulated judgment].)  Moreover, the Peace Agreement was specifically approved and executed by the Pools acting in their representative capacity. In the resolution approving the Agreement, the Ap Pool "authorize[d] the Chairman to execute the Peace Agreement on behalf of the Appropriative Pool."

Given the 40-plus year history of representative actions by the Pools, coupled with appellants' consent or acquiescence, we reject appellants' characterization of its Pool's role as a powerless "administrative and advisory" body.  As Watermaster aptly notes, a single representative voice from each Pool is "wise, balanced, and useful in optimizing the efficient use of water in the Basin, facilitates compromise, and affords all individual parties a voice in the process while preserving their remedy to challenge Watermaster actions."

17

*B. The TOA is Consistent with the Judgment, the Peace Agreement, and the*
*Superior Court's Orders.*

Appellants contend the TOA is inconsistent with the Judgment, the Peace Agreement, and the court's May 28 and December 3, 2021 orders because it alters the extent of the Ap Pool members' obligation under section 5.4(a) of the Agreement and the methodology for ascertaining the amount of that obligation.

As previously noted, the Judgment, the Peace Agreement, and the parties repeated acquiescence in the representative actions by the Pools, acknowledged each Pool's right to act upon the consent of a majority of its members. The Peace Agreement established the Ap Pool's commitment to pay the Ag Pool's legal expenses. As parties to the Agreement, appellants consented to such commitment. For decades, they fulfilled this commitment, spending public funds to do so. However, when the Ag Pool's legal expenses nearly doubled, appellants challenged the amount requested via judicial intervention. On May 28, 2021, the superior court found merit in their challenge and ruled that section 5.4(a) of the Peace Agreement does not obligate the Ap Pool to pay unlimited Ag Pool expenses "without knowledge of the nature of the expenses." Rather, when challenged, the Ag Pool must demonstrate that the expenses were for services that benefitted it and were not adverse to the Ap Pool. However, nothing in the May 28, 2021 order proscribed settlement of the disputed amount as a means of resolution.

Nonetheless, Ontario argues the TOA violates due process as determined in the May 28, 2021 order by committing the Ap Pool to pay legal expenses that may not have complied with the procedure prescribed by the superior court. Not so. As the Ap Pool

notes, this procedure applies only "[i]f the parties cannot come to an agreement themselves (as the court states they may do in paragraph 7)." Paragraph 7, in relevant part, provides, "Judgment ¶54 and Peace I § 5.4(a) mean that, of course, the Ag Pool and the [Ap] Pool can agree to a determination to [*sic*] about payment of 'litigation expense.'" In reaching the TOA, the parties employed the procedure contemplated by the court in its May 28 order. The TOA states that it is "in furtherance of and without abrogation of the provisions of the May 28, 2021, San Bernardino Superior Court Order (the Order)[,]" and that it is "made for purposes of settlement within the interpretational parameters of the Order. These Terms of Agreement and the Order shall be construed together." Moreover, the TOA included the same conditions on payment the court had described in its May 28 order. Thus, the TOA is consistent with the May 28, 2021 order.

Likewise, the TOA is not inconsistent with the superior court's December 3, 2021 order denying the Ag Pool's motion for attorney fees. The court denied the motion "in its entirety, on the basis that all fees sought by the [Ag] Pool are either for activities that were adversarial to the [Ap] Pool *or, in the alternative*, the Court could not determine whether the claimed fees were fair, reasonable, appropriate, and consistent with the Court's May 28, 2021 Order, due to the level of redaction of the invoices supporting such claimed fees." Specifically, the court "found redactions to be so extensive to make most of the bills meaningless for review by the opposing counsel and a determination by The Court." Like the May 28, 2021 order, nothing in the December 3, 3021 order proscribed settlement of the disputed amount as a means of resolution. Again, the TOA manifests the agreement between the two Pools regarding the amount of 2020-2021 legal expenses

19

the Ap Pool was obligated to pay the Ag Pool according to the terms of the Peace Agreement. It does not impose any additional obligation on appellants, or require them to pay any expenses they had not already agreed to pursuant to the Peace Agreement.

### C. Appellants' Remaining Arguments are Nothing More Than Red Herrings.

Appellants' remaining arguments challenging the superior court's denial of their motions for reimbursement include: (1) A majority of the Ap Pool may not bind a public agency; (2) There is no implied contract authorizing the Ap Pool to bind appellants[5]; (3) The equities do not support a quasi-contract; (4) Imposition of the TOA violates public policy and denies appellants their right to seek judicial review; and (5) The court erroneously relied on equitable doctrines to preclude appellants' reimbursement motions. As we explain, these arguments amount to nothing more than red herrings.

Appellants are parties to the Judgment and the Peace Agreement, both of which set forth their rights and obligations. Nothing in the TOA imposed any additional financial obligation on any public agency that it had not already agreed the Ap Pool would pay (funded by its members) according to the Peace Agreement. However, since the annual amount of this obligation was not specified nor limited in the Peace Agreement, appellants rightly sought judicial intervention when the Ag Pool sought $563,000 in fees (including more than $102,000 to reimburse Watermaster's administrative reserves). In

---

[5] Having found the TOA to be consistent with the Judgment, the Peace Agreement, and the superior court's prior orders, we reject appellants' challenge to the finding of an implied contract that authorizes the Ap Pool to bind them by the majority vote on its decisions. Moreover, as the Ap Pool points out, the implied contract theory was an alternative ground cited by the court in support of its ruling.

20

response, on May 28, 2021, the superior court ruled that section 5.4(a) of the Peace Agreement does not obligate the Ap Pool to pay unlimited Ag Pool expenses "without knowledge of the nature of the expenses." Rather, the Ag Pool must show that the claimed fees are fair, reasonable, and appropriate. If the Ag Pool satisfies this showing, the Ap Pool pays the amount requested. If not, the two Pools may negotiate an acceptable amount. If negotiations are unsuccessful, then the Ap Pool may seek judicial intervention where the Ag Pool will have to prove to the court its right to the requested fees.

Here, although the two Pools engaged in settlement discussions throughout 2021,[6] when no settlement was reached, the Ag Pool sought judicial intervention. The superior court denied the Ag Pool's request for fees, and it appealed. In response, the Pools continued to seek a resolution of their dispute. Simultaneously, appellants filed their motions for reimbursement. By the time their motions were heard by the court, the Pools had reached a compromise. According to the TOA—which was approved by a majority vote of each Pool's membership according to the Judgment—the Ap Pool agreed to pay $370,000 of the disputed $563,000. Of the $370,000, the Ag Pool would pay $102,557.12 to reimburse Watermaster's administrative reserves. In exchange for the Ap Pool's agreement to pay $370,000, the Ag Pool agreed to dismiss its appeal.

---

[6] According to John Bosler, General Manager of the Cucamonga Valley Water District (a member of the Ap Pool) and Chair of the Ap Pool in 2021, the Ap Pool, the Ag Pool, and other representatives (including from Ontario) met several times from May through September 2021, to engage in good faith discussions regarding potential terms and conditions of a comprehensive settlement agreement to resolve the Ag Pool's disputed expenses.

21

Additionally, the TOA clarified the Peace Agreement—specifically the Ap Pool's obligation to pay for the Ag Pool's legal expenses—by defining the procedures for processing the Ag Pool's requests going forward.

Contrary to Chino's assertion, the TOA has not denied them their right to judicial review. In denying appellants' reimbursement motions, the superior court reviewed the relevant documents and considered appellants' arguments. Nonetheless, it concluded the TOA was valid, binding on all Ap Pool members, and resolved all issues raised. Appellants have appealed the court's order, and, after reviewing the record and considering the parties' arguments, we conclude the superior court correctly denied their motions. There has been no denial of any party's right to judicial review.

Likewise, we do not agree the TOA violates public policy or rises to an unlawful gift of public funds. Appellants are liable for their share of the Ag Pool's expenses as members of the Ap Pool. The issue was not whether the Ap Pool must pay the Ag Pool's request of $563,000, but how much it must pay. Facing the Ag Pool's appeal of the superior court's order denying its request for payment, the Ap Pool engaged in settlement discussions and was able to resolve the good faith dispute via the TOA. As the Ap Pool notes: "The settlement of a good faith dispute between the State and a private party is an appropriate use of public funds and not a gift because the relinquishment of a colorable legal claim in return for settlement funds is good consideration and establishes a valid public purpose." (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 450; *id*. at pp. 450-451 [unlawful gift where attorneys had no colorable claim to fees in excess of $18 million]; see *Orange County Foundation v. Irvine Co*. (1983) 139

22

Cal.App.3d 195, 200-201 [holding that, when state funds are used to satisfy "wholly invalid claim[s]" "no 'public purpose' is achieved].)

Finally, the superior court did not erroneously rely on equitable doctrines to preclude appellants' reimbursement motions. As respondents aptly note, it is not the delay in the filing of appellants' reimbursement motions that gives rise to laches. Rather, it is the late change in their position regarding their responsibility for paying the Ag Pool's legal expenses (which they have done for 20 years), along with their acquiescence in the representative structure of the Pools for more than 40 years. As the superior court stated, "the length of time that the parties/dissenters have failed to raise their qualitatively legal objections in court to the [Ap] Pool's payment of the Ag Pool's legal expenses has the following consequences: [¶] a. They are barred by laches. [¶] b. They are waived." (*In re Marriage of Fogarty & Rasbeary* (2000) 78 Cal.App.4th 1353, 1359 ["Laches is an equitable defense to the enforcement of stale claims. It may be applied where the complaining party has unreasonably delayed in the enforcement of a right, and where that party has either acquiesced in the adverse party's conduct or where the adverse party has suffered prejudice thereby that makes the granting of relief unfair or inequitable."].) Similarly, appellants may not challenge the amount of any prior payment (2019-2020) by the Ap Pool to the Ag Pool, which was assessed, reviewed, approved, and paid without objection. Since appellants failed to raise a timely objection, the court correctly found that they had waived any challenge.

*D.  Conclusion.*

For more than 40 years, disputes over Watermaster decisions, Pool actions, and party actions have fallen within the superior court's continuing jurisdiction, and they continue to do so.  Here, appellants have used their dispute over the propriety of the Ag Pool's invoices—sanctioned by the Peace Agreement—to challenge the Ap Pool's authority to act in a representative capacity under the Judgment.  In denying their reimbursement motions based on a finding that the Pools executed a valid settlement, the TOA, the superior court correctly concluded that neither the Judgment nor the Peace Agreement requires the Ap Pool to obtain unanimous consent of its members to act.  To hold otherwise would disrupt the efficient management of the Basin as provided for in the Judgment.

## III.  DISPOSITION

The order is affirmed.  Respondents are to recover costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.


We concur:


MILLER
J.


CODRINGTON
J.

24